[No. A095229. First Dist., Div. One. June 25, 2002.]

ESPRESSO ROMA CORPORATION et al., Plaintiffs and Appellants, v. BANK OF AMERICA, N.A., Defendant and Respondent.

**Counsel**

A. Charles Dell'Ario for Plaintiffs and Appellants.

Gregory Scott Spencer; Buchalter, Nemer, Fields & Younger, James B. Wright and Mia S. Blackler for Defendant and Respondent.

## OPINION

**STEIN, Acting P. J.**—Espresso Roma Corporation, Pacific Espresso Corporation, and David S. Boyd doing business as Hillside Residence Hall (appellants) appeal from a judgment dismissing their complaint alleging several causes of action against Bank of America, N.A. (Bank), based upon its payment of forged checks drawn on appellants' accounts by one of their former employees. The court entered judgment in favor of the Bank after it granted the Bank's motion for summary judgment on the ground that appellants were precluded by California Uniform Commercial Code[1] section 4406, subdivisions (d) and (e) from asserting any claims against the Bank for unauthorized payment of checks drawn on their accounts. We shall affirm the judgment.

### FACTS

David S. Boyd is the president of Espresso Roma and Pacific Espresso Corporations and also runs Hillside Residence Hall. All three businesses had checking accounts with the Bank.

From late 1996 through April 1999, appellants employed Joseph Montanez, who eventually assumed certain bookkeeping responsibilities, learned how to generate company checks on the computer, and had access to blank checks. Starting in October 1997, Montanez downloaded company computer programs, stole blank checks, and printed company checks on his home computer which he used to pay his personal bills, and for personal purchases. He concealed his actions by removing the forged checks from the bank statements when he sorted the mail.

Boyd did not discover the forgeries, or report them to the Bank until May 1999. After Montanez left the company, a check was returned by a stereo company, bearing a signature that Boyd did not recognize. Boyd then reviewed the records and discovered that, from October 1997 through April 1999, Montanez had forged company checks in an amount totaling more than $330,000.

### ANALYSIS

The Bank's motion for summary judgment was based upon section 4406, which limits a payor bank's liability to its customer for making payment upon checks with alterations or unauthorized signatures.

---

[1] All subsequent statutory references are to the California Uniform Commercial Code unless otherwise indicated.

Pursuant to subdivision (f) of section 4406, the Bank asserted that appellants were absolutely precluded from asserting forgeries processed more than one year before the forgery was reported. By its terms subdivision (f) applies, "[w]*ithout regard to care or lack of care of either the customer or the bank*," (italics added) and precludes "a customer who does not within one year after the statement or items are made available to the customer . . . discover and report the customer's unauthorized signature" from asserting it against the Bank. The Bank also relied upon the conditional preclusion established by subdivisions (d) and (e) of section 4406. Subdivision (c) of section 4406 imposes a duty upon the customer promptly to review monthly statements or checks made available to the customer by the bank, to exercise reasonable care in discovering any unauthorized signature or alteration, and promptly to notify the bank of the discovery of such items. Pursuant to subdivision (d), if the customer fails to comply with these duties, when the same person has forged checks on the account, the customer is precluded from making a claim against the bank for the unauthorized payment unless the customer notified the bank no more than 30 days after the first forged item was included in the monthly statement or canceled checks, and should have been discovered. (§ 4406, subd. (d)(2).) This preclusion is conditional because the customer may avoid its application by establishing that the bank "failed to exercise ordinary care in paying the item and that the failure contributed to [the] loss." (§ 4406, subd. (e); *Roy Supply, Inc. v. Wells Fargo Bank* (1995) 39 Cal.App.4th 1051, 1062-1064 [46 Cal.Rptr.2d 309].)

In its order granting summary judgment, the court held that appellants were precluded by "sections 4406(d) and 4406(e) from asserting claims against the [B]ank for unauthorized payments of checks drawn on [appellants'] checking accounts." The court specifically ruled that appellants failed to create a triable issue of fact as to whether "the [B]ank's system of processing checks for [appellants' accounts] violated the [B]ank's . . . procedures" or varied unreasonably from general banking usage in the area. The court also ruled that the declaration of appellant's expert failed to create a triable issue of fact "as to whether the [B]ank failed to exercise ordinary care," and that the Bank had no duty to sight review the checks.[2]

■ Appellants argue that the burden never shifted to them to create a triable issue of fact because the Bank failed to meet its "burden of production to make a prima facie showing of the nonexistence of any triable issue

---

[2]The Bank contends that, even if triable issues of fact existed on the issue of exercise of ordinary care, the absolute preclusion set forth in section 4406, subdivision (f) applied, and was shortened by contract to a period of six months, thereby barring nearly half of appellants' claim without regard to exercise of ordinary care. We need not reach this contention because we shall uphold the summary judgment upon the ground that no triable issue of fact existed with respect to the application of the conditional preclusion set forth in section 4406, subdivisions (d) and (e).

of fact," that (1) despite the availability of monthly statements and canceled checks, appellants failed to discover and notify the Bank of the forgery within 30 days, and (2) it exercised ordinary care in paying the item. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [26 Cal.4th 80a, 107 Cal.Rptr.2d 841, 24 P.3d 493]; Code Civ. Proc., § 437c, subd. (o)(2).) Appellants further contend that, even if the burden did shift to them, the declaration of their own expert created a triable issue of fact on the issue whether the bank exercised ordinary care, precluding summary judgment in the Bank's favor.

### 1. *Appellants' Failure to Discover and Report the Forgeries*

Pursuant to section 4406, subdivision (d), the customer is precluded from making a claim against the bank for unauthorized payment unless the customer notified the bank no more than 30 days after the *first* forged item was included in the monthly statement or canceled checks and should have been discovered. (§ 4406, subd. (d)(2); see also Official Comments on U. Com. Code, West's Ann. Cal. U. Com. Code (2002 ed.) com. 2, foll. § 4406, p. 190.)[3]

According to the complaint, the forged checks were presented for payment between October 1997 and May 1999, but appellants did not discover or report them until on or about May 15, 1999. To establish its prima facie case that the conditional issue preclusion created by section 4406, subdivision (d) applied, the Bank presented the deposition testimony of Boyd, that it made monthly account statements and canceled checks available to appellants shortly after the closing period of each statement. Boyd testified that he received statements on a monthly basis, and they included canceled checks. When Boyd began to suspect unauthorized checks were being written and reviewed the statements and checks in May 1999, he was able to identify, and reported, the forgery. This evidence supports the inference that the first monthly statement that would have reflected the forgery by Montanez would have been in November 1997 (see *Mac v. Bank of America* (1999) 76 Cal.App.4th 562, 566 [90 Cal.Rptr.2d 476] [where forged checks cleared account between March and May 1966, it was inferable that statements from

[3]The California Uniform Commercial Code comment 2 explains: "Subsection (d)(2) applies to cases in which the customer fails to report an unauthorized signature or alteration with respect to an item . . . and the bank subsequently pays other items of the customer with respect to which there is an alteration or unauthorized signature of the customer and the same wrongdoer is involved. If the payment of the subsequent items occurred after the customer has had a reasonable time, (not exceeding 30 days) to report *with respect to the first item*, and before the bank received notice of the unauthorized signature or alteration *of the first item*, the customer is precluded from asserting the alteration or unauthorized signature with respect to the subsequent items." (Official Comments on U. Com. Code, 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, com. 2, foll. § 4406, p. 190, italics added.)

April through June reflected those checks]). Yet, despite having the means to discover the forgeries, more than a year and a half elapsed before appellants discovered and reported any of them, far beyond the 30 days specified in section 4406, subdivision (d).

Appellants argue, as they did below, that Boyd's testimony did not support the Bank's assertion that it made monthly checks or statements available because Boyd also testified that there were some instances in which the statements or checks did not arrive through the mail in a timely fashion. Boyd, however, acknowledged that when this occurred he was able to pick up the statement or a duplicate at the branch. Nothing in Boyd's testimony contradicts the Bank's assertion that it made monthly statements available to appellants in accordance with section 4406, subdivision (a). Nor is there any merit to appellants' assertion that the Bank was required to submit the statements and canceled checks themselves, or a declaration of a bank officer that it made them available, instead of relying upon Boyd's admission, which was competent and admissible evidence (Code Civ. Proc., § 437c, subd. (c)).

Appellants also suggest that the Bank was required to establish, with respect to *each forged check*, exactly *when* it made the monthly statement including the forged check available, thereby providing the means by which appellants should have discovered the forgery, and triggering the 30-day notification period. To the contrary, where as here, the forgeries are all committed by the same person, it is the failure to report the first forged item within 30 days that precludes the customer from asserting the subsequent forgeries (§ 4406, subd. (d)(2)). Regardless of the exact date the first monthly statement after October 1997 was made available to appellant, the evidence the Bank submitted established that it made statements and checks available on a monthly basis, yet the first forgery was not reported until mid-May 1999, long after the 30-day period expired.

2. *Evidence That the Bank Exercised Ordinary Care*

Having established a prima facie case that the Bank made monthly statements and checks available, and that appellants failed to notify the Bank within 30 days, the issue preclusion pursuant to section 4406, subdivision (d) applies unless the customer can establish that the bank, "failed to exercise ordinary care in paying the item and that the failure contributed to [the] loss." (§ 4406, subd. (e).) "Ordinary care" is defined by section 3103, subdivision (a)(7) as follows: " 'Ordinary care' in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the

business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this [D]ivision [3] or Division 4 (commencing with Section 4101.)"

As explained in *Story Road Flea Market, Inc. v. Wells Fargo Bank* (1996) 42 Cal.App.4th 1733, 1742 [50 Cal.Rptr.2d 524], a case in which the court upheld a motion for summary judgment in the Bank's favor based upon section 4406, subdivisions (d) and (e), ordinary care as used in section 4406 is a " 'professional negligence' standard of care which looks at the procedures utilized in the banking industry rather than what a 'reasonable person' might have done under the circumstances." (42 Cal.App.4th at p. 1741.) " '[R]easonable commercial standards do not require the bank to *examine the instrument* if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage.' " (*Id.* at p. 1742, italics added.)

The Bank, in support of its motion for summary judgment, presented a prima facie showing that it exercised ordinary care, through the declaration of its expert, Jack Thomas. In addition to stating his qualifications as an expert in the field, Thomas declared that he was "familiar with the check processing strategies and procedures employed by banks similarly sized to Bank of America, including those within the San Francisco Bay area, which are 'bulk file bookkeeping' banks." He further explained that "Bank of America is a 'bulk file bookkeeping' check processor," meaning that it processes checks automatically and does not visually examine individual checks or verify signatures. Thomas declared that Bank of America processes in excess of 1,000,000 checks per day in California, and although it uses fraud filters, they are not designed to "catch a crooked employee who forges his employer's checks, which only the employer would know are forged." Thomas declared that the Bank's "practices and procedures are consistent with those of all other large 'bulk file bookkeeping' banks in California." Thomas also "verified with the responsible [B]ank officer that [the Bank] followed its procedures with respect to the checks at issue in this litigation when it processed the checks." He concluded that the Bank "exercised ordinary care in processing [appellants'] checks . . . in observance of reasonable commercial standards prevailing in the area in which Bank of America is located, and where [appellants] maintained their accounts."

Appellants argue that this declaration was insufficient to define the reasonable commercial standard "in the area," (§ 3103, subd. (a)(7)) and failed

to demonstrate that the Bank's automated check processing did not vary unreasonably from general banking usage, because the expert stated that the Bank's practices conformed to commercial standards for "bulk file bookkeeping" in all of California and considered only the practices of similarly sized banks. Appellant, however, takes the reference to the entire State of California in isolation and out of context, because the expert specifically stated that he was also familiar with the practices of similarly sized banks in the "San Francisco Bay area." Thus, read as a whole, the expert's declaration expressed the opinion that the Bank's practices conformed not only with those of similarly sized banks in the Bay Area, but also with similarly sized banks in the State of California. Nor are we persuaded by appellant's contention that it was necessary to offer expert opinion that the Bank's practices were consistent with those of *all* banks in the area, not just those of similarly sized banks. To the contrary, section 3103, subdivision (a)(7) defines ordinary care as "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged," meaning the standard of reasonableness is set by comparable businesses. (See Official Comments on U. Com. Code, 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, com. 4, foll. § 4406, p. 191 [ordinary care is established if the bank's "procedure is reasonable and is commonly followed by other comparable banks in the area" and was followed by the bank in processing the checks in issue.]) Size is a relevant factor in identifying comparable businesses because, in the banking context, a reasonable commercial standard for processing checks at a small bank with a relatively small volume of checks, and personal familiarity with its customers, would be quite different than what is reasonable for a large bank that processes upwards of a 1,000,000 checks per day. Thomas's declaration therefore established that the reasonable industry standard prevailing in the area for similarly sized banks was to bulk process checks through an automated system that employs fraud filters, but does not include sight review of individual checks for signature verification. The Bank's procedures conformed to this standard, which also was consistent with general bank usage as reflected by the practices of other bulk file bookkeeping banks in California, and it followed those procedures in this case. We conclude that Thomas's declaration was sufficient to establish a prima facie case that the Bank exercised ordinary care, thereby shifting the burden to appellant to create a triable issue of fact. (*Story Road Flea Market, Inc. v. Wells Fargo Bank, supra*, 42 Cal.App.4th 1733, 1738, 1743 [expert declaration that bank processed checks, none of which were selected for sight review, in accordance with its own procedures, and consistent with reasonable commercial standards in the area, and general banking practices, shifted burden to plaintiff to create a triable issue of fact].)

Although appellants submitted the declaration of its own expert, John Moulton, in opposition, the trial court correctly concluded that it failed to

create a triable issue of fact on the question whether the Bank "failed to exercise ordinary care in paying the item *and* that the failure contributed to [the] loss." (§ 4406, subd. (e), italics added.) Moulton declared that he called upon "large and small banks in Alameda County to inquire of their actual practices." These banks make decisions for payment of items at the branch where the account is kept and have the "means to check signatures for forgeries" present, whether it be by signature card or digital imaging. He also declared that these banks would manually examine checks which resulted in an overdraft, were unsigned, or exceeded a certain amount. He further declared that there were four instances of daily overdrafts occurring on days in which forged checks were processed, and one unsigned check that was processed and paid, all without selecting the checks for manual review.

The fundamental defect in Moulton's declaration is that, instead of defining the applicable reasonable commercial standard of care by looking at comparably sized banks using bulk file bookkeeping, he bases his opinion that the standard of care requires certain checks be selected for sight review, or other special handling, upon the practices of large and small banks. Without a showing that *comparable* banks in the area select individual checks for sight review, the fact that the Bank's system did not select individual checks for sight review, or signature verification, is insufficient to create a material issue of fact because section 3103, subdivision (a)(7) specifies that "reasonable commercial standards *do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage.*" (Italics added.) Therefore, Moulton's declaration does not create a triable issue of fact with respect to the Bank's showing that its system of bulk processing of checks, which does not include sight review for signature verification, is commercially reasonable, and consistent with the practice of other comparably large banks in the area and in California.

Moreover, assuming arguendo that reasonable commercial standards did require that the Bank have established criteria for selecting some checks for sight review, Moulton's declaration still fails to create a triable issue of fact because it provides no basis to infer that the failure to have such a system *contributed to the loss.* (§ 4406, subd. (e) [the customer must show the Bank "failed to exercise ordinary care in paying the item *and* that the failure contributed to [the] loss" (italics added)].) Moulton does not specify what the criteria should be, in an automated check processing system that selects some checks for sight review, other than reviewing a check that causes an overdraft, or is in excess of some unspecified amount. Although Moulton declares that daily overdrafts occurred on four of the days forged items were

processed, Moulton does not declare that it was forged checks which caused the overdrafts. Similarly, although Moulton identifies a check that was paid without a signature, he does not state whether this check is one of the items that appellants contend were paid without authorization, or how such a check would be identified and selected for sight review under the criteria he declares are commercially reasonable. Nor does he declare that any forged check was in an amount that, pursuant to the criteria he suggests, would have resulted in its selection for sight review. Therefore, even if such a system of selection for sight review had been used by the Bank, the declaration provides no basis for inferring that any of the unauthorized checks would have been selected for sight review, resulting in earlier discovery of the forgeries. Therefore, the declaration does not create a triable issue that the failure to have such a system contributed to the loss. (See *Story Road Flea Market, Inc. v. Wells Fargo Bank, supra,* 42 Cal.App.4th 1733, 1744 [expert declaration that unauthorized checks were out of sequence failed to create an issue of fact, because under stated criteria for selecting checks for sight review, unauthorized checks would still not have been selected for sight review].)

Appellants also argued a triable issue of fact existed that the Bank failed to exercise ordinary care, based upon Moulton's declaration that the standard of care included having the "means" available to verify signatures, and appellants' factual assertion that the Bank had been unable to locate the signature cards relating to appellants' accounts. However, neither the Bank's own procedures, nor reasonable commercial standards, required that the bank sight review any of the forged checks (see § 3103, subd. (a)(7)). Absent a duty to verify the signatures, or evidence that the Bank's own procedures required sight review of any of the forged checks, it is irrelevant that the Bank could not locate the signature cards, and the fact that they were missing could not have contributed to appellants' loss. (§ 4406, subd. (e) [plaintiff must show that the bank's failure to exercise ordinary care contributed to plaintiff's loss].)

In a final attempt to create a triable issue of fact regarding the exercise of ordinary care, appellants also relied below upon evidence that, "[a]fter the forgeries in the Hillside account were discovered and the account was closed in May 1999," the Bank incorrectly changed the address on the account to Montanez's address, and also that the Bank did not conduct an adequate investigation of the forgeries after they were reported. Appellant's burden, however, was to create a triable issue of fact that the Bank "failed to exercise ordinary care *in paying* the item." (§ 4406, subd. (e), italics added.) The asserted facts regarding the incorrect address and mishandling of the investigation are irrelevant and fail to create a triable issue of fact because they relate to events occurring long after the items were paid.

We conclude that the court properly granted the Bank's motion for summary judgment on the ground that section 4406, subdivisions (d) and (e) precluded appellants from asserting claims against the Bank for unauthorized payments of checks drawn on their checking accounts, and that appellants failed to create a triable issue of fact as to whether they failed to exercise ordinary care in paying the items and that the failure contributed to their loss.

## CONCLUSION

The judgment is affirmed.

Swager, J., and Margulies, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 2, 2002. Chin, J., did not participate therein.